CITED *in Evans' Ex'r* v. *Huffman,* 1 *Hal. Ch.* 362.

---

DEN EX DEM. B. W. MICKLE v. J. MATLACK AND J. GITHENS

In Ejectment for lands in Gloucester.   On motion for a New Trial.

The Statute of Wills, for devising Real Estate in New-Jersey, requires the Testator to *sign* his name, *in the presence* of witnesses; and no mere acknowledgment in their presence, of his signing a Will, can make it good for the conveyance of lands, under the Statute.

Although three subscribing witnesses are requisite to the attestation of a Will, it is not necessary that they should all prove the execution of it. One of them is sufficient for that purpose.

This cause was argued at February Term, 1838, by Messrs. Jeffers and Williamson for plaintiff, and Messrs. Halsted and Frelinghuysen, for the defendants.

At May Term, 1838, the Court delivered their opinions, refusing a new trial; but at the earnest request of the plaintiff's counsel, consented to hear a

second argument on the motion; which was accordingly made at February Term, 1839, by

*Jeffers & I. H. Williamson*, for plaintiff.
*Browning & Frelinghuysen*, for defendant.

At this Term, the following opinions were delivered; except that of the Chief Justice; which is the same which he read after the first argument, and was received by the Reporter, after the close of May Term, 1839.

☞ See the note at the end of his opinion.

The Reporter has received a copy of the evidence given on the trial of this cause before Mr. Justice Ryerson, at the circuit, which is considered too voluminous for publication. The charge of the Judge, is given below; which, with the statements contained in the opinions of the Justices, delivered in this Court, are supposed to exhibit all the important facts and points in the case.

JUDGE RYERSON'S CHARGE.

Gentlemen of the Jury,
The simple question for you to try, is, has Benjamin W. Mickle, the lessor of the plaintiff, a title to the premises in dispute?

It is admitted on all hands, that Andrew F. E. Mickle commonly called, and whom *I* shall call Dr. Mickle, died seized in fee of the lands in question, that is, in the possession, as the absolute owner thereof.

It is also admitted, that Benjamin W. Mickle, the lessor, the real plaintiff, and whom we may, for convenience and without error, designate *as* plaintiff, is the sole heir at law of Dr. Mickle.

It necessarily follows from these facts, that your verdict should be for the plaintiff, unless you be satisfied from the evidence in the cause, that Dr. Mickle has devised, or given it away by a last Will and Testament, duly executed, according to the formalities of our act of Assembly. Nor is it necessary to perplex your minds with any of those formalities not drawn into discussion, by the evidence in this cause, and about which there exists no doubt.

Your first inquiry will be—*was the Will in question signed by Dr. Mickle, in the presence of three subscribing witnesses?  It was*

*not necessary that* they should all actually see him sign. If they were placed, as witnesses, in a situation in which they might have seen it signed, by giving their attention thereto ; it is sufficient, though, at the very instant of signing, their sight may have been directed another way, or from inattention, they did not see it. But if signed in another place, where they, or any one of them were not present, or in the same place, before they, or any one of them had come in, and they only heard the signing acknowledged, it has not been duly executed. The absence from this ceremony of signing, of a single one of the witnesses, is as fatal to its validity, as if they were *all* absent.

But, although it be necessary that they all saw, or were in a situation to see, it is not necessary that they should all remember the fact. Even if they or some of them should contradict it and say that they did not see, or were not present ; yet if the fact be satisfactorily made out by other witnesses, the Will is duly proved.

Again, as to publication. Any thing said and done with. the co-operation and concern of the testator, which manifests to the witnesses, his knowledge of the act about which he was engaged, and his intention to give it validity, is a sufficient publication. And it is not absolutely necessary—though the most natural and orderly course, that this publication should follow the signing. If done at the same time as a part of the same transaction, it is sufficient, whether the signing be the first or the last part of the ceremony.

The question seems involved in uncertainty. While one of the subscribing witnesses swears, that they were all present at the signing ; another one says he did not see it signed. And another witness who was by, though he did not subscribe as a witness, is still more positive that it was not there signed. And both concur in a statement, inconsistent with the statement of the first witness ; and repressing the idea that they were present at the signing, and in this they are corroborated by the third subscribing witness on his first examination ; though he afterwards contradicts himself in an extraordinary manner, and testifies to the signing in his presence. And the manner in which he has attempted to account for this change of opinion, and the circumstances under which the change took place, it would seem, ought

Den ex dem. Mickle v. Matlack et al.

very much to impair the credit of his second, or re-examination. It would fully warrant the Jury in laying entirely out of the case, all that he said when called a second time. But it is competent for you to say, whether under all the evidence in the cause, his first, or second statement of the transaction be according to the fact, as you shall believe the truth to be.

The above, seem to be all the points about which you will need, or it is my duty to give you any instruction. It may not however, be improper to remark, that it *is* necessary, that the Testator should know the contents of the Will. But it is not necessary, in this case, for the Defendants to give any evidence to prove that he had such knowledge. The law presumes he had it, and that presumption is sufficient till the contrary be proved. The sanity of the Testator is not drawn in question by the evidence in the cause. The law presumes every man sane till the contrary be proved.

The registry with the depositions of witnesses, annexed to the Will, are evidence in this cause. Though it ought not to receive the same credit or attention, as the open examination of the same witnesses here. This for various reasons ; and first, because the proceeding was ex parte. The second, because it is regarded very much as a formal proceeding, and the parties concerned, not likely in all cases, strictly to regard formal matters which they do not at the time regard as important.

It is your peculiar province to settle the credit due to the witnesses, and ascertain the facts. If you, from the evidence in the cause, find the Will duly executed, your proper verdict will be, that the defendants are *not guilty*. But if you do not so find, your verdict should be, that the defendants *are guilty*, with an assessment of nominal damages, six cents in favor of the plaintiff— and six cents costs.

*The Jury found a verdict for defendants.*

HORNBLOWER, C. J. That Dr. Mickle intended to make a Will ; that he was competent to make a Will ; that he did make and sign, and sufficiently publish one, are facts that have not been seriously questioned, and cannot, I think, be rationally doubted, upon the evidence in this cause. But because there is some uncertainty, whether the testator

" actually " *wrote* his name to the Will, in the presence of all the subscribing witnesses, the validity of the instrument is denied, and we are called upon to set aside the verdict, and grant a new trial.

If an " actual" signing by the testator in the *presence* of the witnesses, is essential to the valid execution of a Will, as was held by this Court in *Den* v. *Mitton,* (7 *Halst. R.* 70) decided in September Term, 1830, then I should be inclined to grant a new trial.    Indeed I do not see how we can do otherwise, since one of the subscribing witnesses, has persisted to the last, that the Will was not signed in his presence ; and whether it was signed in the presence of either of them, is extremely doubtful upon the testimony.

.  When the counsel for the defendants, on the first argument of the rule, threw out some remarks, adverse to the decision in *Den* v. *Mitton,* I felt it my duty, to intimate from the bench, as I then did, my willingness to hear that matter discussed.    I did so, not from any desire to unsettle the rules of law ; and no one who knows the high opinion I have always entertained of the learning and judicial talents of the late Chief Justice, and those then associated with him, will for one moment question my sincerity when I say, that it is with the most painful diffidence, and only under a strong conviction of duty, from which I cannot escape, that I now declare my solemn dissent, from the decision of this Court, in the case of *Den* v. *Mitton.*    I confess, however, that my reluctance to disturb that decision, has been very much lessened, and my mind greatly relieved, since I have understood from the only surviving member of the Court, as then constituted, that it was with many doubts and much hesitation, that he and the other associate Justice yielded to the strongly pressed opinion of the late Chief Justice, in that case.

Having now declared my dissent from that opinion, it remains for me to assign my reasons for doing so.    And

1st, The act for *confirming* of conveyances of lands, made and to be made by Wills, &c. ( *Rev. laws,* 7.) was passed in March, 1714.    It had been in force when the case of *Den* v. *Mitton,* was decided, a period of ONE HUNDRED and SIXTEEN years ; during all which time, one uniform construction had been given to, and one uniform practice obtained under it.  Up to that period, no one

had ever doubted, but an acknowledgment by the testator, of his signature in the presence of the witnesses, was constructively such a signing in their presence, as satisfied the meaning of the Statute.

I think I hazard nothing in making this assertion. Chief Justice Ewing, admits that the clause of the statute under consideration, had not, so far as he knew, up to that period, (1830) ever received any "judicial determination." And is it credible,—can it be admitted for one moment, that if any dubiety had ever existed in the public mind, or in the opinion of Judges, or even in the ever active and fruitful imagination of the profession, as to the meaning of the statute, that among the multitude of Wills, that have been made and contested during the last 116 years, this point would never have been raised for judicial determination ! That it has not been, can only be accounted for upon one or two suppositions ; either that none of the learned men who have adorned the New-Jersey bar and bench, during that long period, nor even any of the distinguished jurists that have frequently been called to their aid from neighboring States, ever had ingenuity enough to discover the objection ; or else, that all have understood, and always understood, that our statute only required in substance, that Wills should be "attested" by three witnesses. The former of these suppositions cannot be admitted, without imputing to those who have gone before us, a most discreditable want of professional sagacity ; and assuming to ourselves a degree of legal accuracy and discernment, which others may not be willing to concede to us.

That this objection had never been urged prior to the case of *Den* v. *Mitton,* can only be accounted for, then, upon the supposition, that up to that time, the law had been considered as settled in the State of New-Jersey, that a Will "attested" by three witnesses, was sufficient to pass real estate. It would be equally unreasonable and inadmissible, to suppose that among all the controverted Wills, not a single case had ever happened prior to *Den* v. *Mitton,* in which the Will had not been "actually" signed in the presence of the witnesses. Such cases have actually occurred within my recollection ; and, I have no doubt, within the professional experience of many members of this bar ; but no such objection was ever raised, because it was not supposed to

be necessary that the *manual operation* of signing the *Will*, should be performed in the presence of the witnesses.    My own practice for thirty-five years; and indeed I may say for forty years, (for I was in the habit of drawing and attending to the execution of Wills, long before I came to the bar,) was never to require, as a matter of any importance, that the testator should " *actually* " sign in the presence of the witnesses; and several Wills I have no doubt, are now on record, proved by my affidavits in the usual form referred to by the Chief Justice, in *Den* v. *Mitton*, which were not " actually " signed by the testator in my presence; and I doubt not, I may appeal to older members of the profession, of which there are still a few at the bar, for the same course of practice and experience on their parts, in relation to this matter. Nor did I ever feel, nor do I now feel, any misgivings of conscience for having proved such Wills, for I then thought, and I now think, the acknowldgment of the testator, of his signature, or the publishing of it as his Will, after he has signed it, is a signing of it in my presence, within the meaning of the law as settled by a tacit, and uniform construction of the statute, for more than a century.

It is true, as was remarked by the Chief Justice, in *Den* v. *Mitton*, that there had never, until then, been any "judicial determination" of the matter.   What then?   Surely it will not be contended, that the construction of a statute, never has been, and never can be considered as settled, unless there has been an express "judicial determination" upon the point.   Such a doctrine is alike opposed to one of our soundest and safest rules of judicial interpretation, and to the stability and security of property.   *Contemporanea expositio est fortissima in lege.*   " Great regard," says lord Coke, " ought, in construing a statute, to be paid to the construction, which the sages of the law, who lived about the time, or soon after it was made, put upon it; because, they were best able to judge of the intention of the makers, at the time when the law was made."   That those judges and lawyers who have gone before us, (whether they were " sages of the law " in the sense of lord Coke, or not, I will not pretend to say,) understood the act of 1714, as only requiring that a Will should be " attested " by three witnesses, I think abundantly clear from the fact, that the oldest members of this bar never thought it was

necessary for the witnesses to see, or be actually present at the signing of the testator, until the decision in *Den* v. *Mitton* was announced. With one accord they say, so far as I have conversed with them, that no trace or tradition of such a doctrine has come down to them from men of former times; and that with them, as with myself, the decision was a matter of astonishment and surprise.—But,

2dly, The statute upon the face of it, bears satisfactory evidence that the legislature did not intend to introduce a new rule on this subject.

Where acts are *in pari materia*, if the same words be used in both statutes, they are to be understood in the same sense, unless a different sense is clearly indicated in one of the statutes, by the connection in which they are used. *A fortiori*, when the same form of expression is twice repeated in the same statute, in relation to the same subject, they are to be understood in the same sense in both places. *The King* v. *Smith*, 4 *T. R.* 414. Now, if I can show the sense in which the legislature used the words " *in the presence of,*" in the first section of the act of 1714, it will be a fair and conclusive legislative exposition, of the sense in which those words are to be understood in the second section, unless there is something in the statute clearly indicating a different use of the words; and which, I respectfully submit, there is not. I affirm then, that by the words, " in the presence of *two* subscribing witnesses," in the first section of the act, the legislature, meant no more, than that the Will spoken of in that section, should be " attested " by two subscribing witnesses. If they intended more than that, and if they had been so understood by courts and lawyers of that day, they in all probability *annulled* instead of confirmed, as they professed to do, many Wills made prior to that time.

The statute of Wills (32 *H.* 8, *C.* 1.) was never formally enacted in this State; nevertheless, the power of disposing of real estate by Will, always existed, and has been exercised from the earliest periods of our colonial government. The act of the 17th of March, 1714, as its title indicates, was an act confirming Wills then made and thereafter to be made, rather than an act prescribing new rules and ceremonies to be observed in making Wills.

The legislature of the Province of East-Jersey, in the year 1682, by *sect.* XX, of the Bill for the General laws of that Province, (*Leaming & Spicer*, 233, 236,) enacted, "that all Wills in writing, ATTESTED, by two credible witnesses, shall be of the same force to convey lands, as other conveyances, being registered in the Secretary's office within this Province, within forty days after the testator's death."

The preamble to the act of 1714, after reciting the act of 1682, and the reasons which induced the Provincial Legislature to adopt it, concludes as follows; "and whereas, pursuant to the said law, many Wills have been made, bequeathing and devising lands, signed by the testator, and ATTESTED only by *two* subscribing witnesses;" and then the statute proceeds; "Be it *therefore* enacted," how? that all last Wills theretofore made in writing, signed by the testator, and ATTESTED by only two witnesses, shall be good and effectual? No; but, "that all last Wills &c. signed by the testator *in the presence of two subscribing witnesses*, &c. shall be valid, &c." Can we then be at a loss to know what the legislature meant in this place, by the words "signed in the presence of?" Did they mean to say, that no Will theretofore made, although "*attested*," by two witnesses, should be valid, unless it had also been "actually" *signed by the testator in the presence* of those witnesses? Certainly not; or else they passed an act *destroying*, instead of *confirming*, such prior Wills. The truth is, the legislature of 1714, intended to confirm all previous Wills, the execution of which had been, *attested* by two witnesses, whether *actually* signed by the testator in their presence, or not; and therefore, in the first section of the act, they must have used, the words, *signed in the presence of*, in the same general sense in which a deed is said and truly said, in a legal sense, to be "*signed, sealed and delivered*" in the presence of a subscribing witness, though the witness neither saw the grantor *sign*, nor *seal* the instrument, but only heard him make the actual acknowledgment of his having done so. Then I would seriously ask, upon what just or rational principle, we can ascribe another and a more definite and limited meaning to the use of those words in the second section? I can conceive of none.

*Ch.* 3, *sect.* 5 of the statute of 29th *Car.* 2, had never been re-

enacted here, nor so far as I can find, had there been any general law of the colony, relating to the execution of Wills, passed, prior to 1714. The probability is, that prior to that period, what had been considered in England a sufficient signing, under the statute of 29 *Car.* 2. by the testator in the presence of the subscribing witnesses, had by a tacit and common consent, been deemed a sufficient signing in such presence here ; namely, an acknowledgment by the testator, that he had signed, or signed and sealed the instrument, as his Will.

The object of the second *sect.* of the act of 1714, was not in my opinion, so much to regulate the ceremony of executing a Will, as to restore to the whole Colony, the rule requiring three witnesses, which had been at least partially broken in upon, by the act of the legislature of East-New-Jersey, in the year 1682.

3dly. I am not able to discover much force in the argument, drawn from the difference of phraseology, between the statute of 29 *Car.* 2, and our act of 1714. At least, it does not strike me, as vastly important. It is true the language of our act, requires the testator to sign, in the presence of three witnesses ; by which I understand, there shall be three *witnesses* to the execution of the will ; whereas the statute of 29 *Car.* 2, says nothing about the testator's signing in the presence of witnesses, but in terms, requires the witnesses to subscribe in *his* presence. But is it any the less necessary under the statute of 29 *Car.* 2, than under our act, that the subscribing witnesses, should be witnesses to the testator's *signature?* Any the less necessary that he should sign in their presence ; or what is the same thing, recognize his signature before them ? Certainly not ; and the very authorities cited by the Court, in 7 *Halst.* 73, go upon the ground that the subscribing witnesses, must be witnesses *to the testator's signature.* What else are the witnesses required by the 29 *Car.* 2, to attest to ? They must subscribe in the presence of the testator, *as witnesses ;* but as witnesses to what, unless it be *to his signature?* Yet it has always been held, as the case in 7 *Halst.* admits, that an acknowledgment is sufficient evidence that the testator did sign the will. The law was so understood in this colony, in 1714 ; and therefore when the act of that date, speaks of signing by the testator in the presence of witnesses, it means I apprehend, just such a signing in their presence, as was neces-

sary under the 29 *Car.* 2. Our action then, does not reverse the ceremony, and require the testator "*actually*" to sign his name in the presence of the witnesses, instead of requiring the witnesses "actually" to subscribe in the presence of the testator. The only difference, if any, in my opinion is, that our act dispenses with the necessity of the witnesses' subscribing their names in the presence of the testator. Indeed, from what was said by Pennington, Justice, in *Den.* v. *Allen,* 1 *Penn. R.* 35, 43, it seems as if he thought it was still necessary, that the witnesses should sign in the presence of the testator : and such I confess has been my impression : and in every instance in which professionally and otherwise, I have been called upon to superintend the execution of wills, I have scrupulously required that ceremony to be so performed. It is certainly more important that the testator should see the witnesses subscribe their names, than that they should *see him* sign his. When he acknowledges his signature to the witnesses, they are in no danger of being deceived ; but if they may subscribe their names, at another time and place, and in his absence, he may have imposed upon his heirs, as his will, that which never was. It is important therefore, that the testator should see the witnesses subscribe their names, that he may be sure, the instrument they are *attesting* as his will, is the identical one, which he has signed or acknowledged to be such. In short, the act of 1714, never was, I believe, until the decision in *Den* v. *Mitton,* considered as altering the ceremony prescribed by the 29 *Car.* 2. It never was considered as introducing a new rule or practice. It only required in terms, what was constructively required by 29 *Car.* 2, as to the subscription of the testator, and was silent as to that of the witnesses ; its principal object being, to restore the former law which required three witnesses ; leaving the ceremonial part as it existed under 29 *Car.* 2. But however this may be, more than one hundred years' practice, has, in my opinion, settled the construction of the act of 1714, too firmly to justify us in disturbing it at this day. Again,

4thly. If the act of 1714, is to receive a strict and literal construction, as if it was a new and independent statute, we must deny to wills, the effect of passing real estate, unless they have been regularly proved and entered upon the books of records in the Secretary's office, or other proper office for that purpose.—

The enactment of the statute is, that all wills thereafter made in the manner prescribed, "*and* regularly proved and recorded" &c. shall be taken and deemed to devise and convey the lands, as effectually as if the testator had conveyed the same in his life time. Yet such a construction has never been contended for, and I presume never will be; for many estates are now held in New Jersey under Wills that have never been proved and recorded. Wills in this State, originally derived their vitality from the statute of Wills; if they depended for their validity upon the act of 1714, I do not see how they could operate to pass real estate, unless proved and recorded as that act directs.

Another reason,

5thly. Why I dissent from the decision in *Den* v. *Mitton*, is, that nothing is gained in point of certainty or security, by the new construction adopted in that case.

The Charge, given to the Jury, in this very case, establishes this position. The judge, before whom the cause was tried, told the jury, in effect, that it was sufficient, if they were satisfied that the will was signed by the testator in the presence of the witnesses, although some, or all of them should positively deny it. And the charge was no doubt correct. What then, let me ask, has been gained by the new rule? Will it not create new difficulties, and embarrass the making and proving of Wills? When shall it be said, that the will was "actually" signed in the presence of witnesses? Must they be actually *looking on*, while the manual operation is performing? or, may their backs be turned, or their eyes closed? or, will it be sufficient, if they are only in the same room, though mingled in a promiscuous crowd, and unconscious of what the testator is doing? or, will it answer, if the witnesses are only in a situation where they may see the testator writing his name, if they choose, or happen to look in the proper direction? All these questions must sooner or later be judicially answered; and when answered, what will be gained by it? I answer nothing; nothing but doubt and uncertainty. "Actual" signing in the *presence* of the witnesses, can give no additional security against impositions, unless we require that the witnesses shall "actually" *see* him sign: and if he require that, then, a designing or forgetful witness could defeat a Will, by denying that he saw the testator sign; since no one could

prove he did actually see the operation, but himself.

Finally; 1 am not unmindful of the value of the maxim, *stare decisis*. It is a regard to the principle of that maxim that compels me to dissent from the case of *Den* v. *Mitton.*

Had this question arose under a recent statute; one of a few years standing; or had it been an unsettled and agitated question, under an old statute, I would not dissent from a decision made by the whole court, though I might differ in opinion. But the decision I complain of, unsettles the law—it was made against the principle of the maxim, *Stare decisis*. The law had been settled for more than one hundred years; settled by the practice of the country, and the acquiescence of Courts, and lawyers, and legislators. It is true, a practice for any length of time, *sub silentio* will not make law, but it is strong evidence of what the law is; and such evidence as ought not to be lightly overturned— *" cotemporanea consuetudo optimus interpretes "*—contemporary custom is the best interpretator.

After all, I should have hesitated longer, before I questioned the decision in *Den* v. *Mitton,* if overruling that decision could possibly do any harm ; but it cannot; it may do good, but it can do no hurt. If wills have been made since 1830, which owing to the peculiar situation of the testator, or an ignorance of the rule established in *Den* v. *Mitton,* were not *actually* signed in the presence of witnesses; it may save such will : and I think it probable that more than half the wills made since that case was decided, have been made in utter ignorance of such a rule. The generality of men, no more think it necessary actually to sign their wills in the presence of witnesses, than to sign their bonds or other deeds in the presence of witnesses. On the other hand, if all wills heretofore made, have been " actually " signed in the presence of the witnesses, so much the better.—They are none the worse for it, and this opinion can do them no harm.

The charge delivered to the jury, by Mr. Justice Drake in the case of *Den* v. *Mitton,* shows what he understood the law to be at that time; and I may be excused for saying that the decision of the court, on this point, was a little more than gratuitous, since the Chief Justice admits, (7. *Halst.* 75.) that upon the evidence contained in the report of the case, there was enough to sustain the will.

I will only add, that from the year 1714, to the time of *Den* v. *Mitton*, a period of ONE HUNDRED and SIXTEEN YEARS, had elapsed, during all which time, there is not to be found on record, a single case in which the validity of any will has been questioned on the ground, that the testator had not, *actually* performed the manual operation of *writing his name* in the presence of the witnesses : nor have we during all that period, any record or traditional account of any fraud having been practised in this state, by substituting one will for another, in consequence of not requiring the testator *actually* to sign in the presence of the witnesses. And I may add too, with confidence, that during all that period, it was never supposed that the act of 1714, had altered the mode of executing wills in this state. But the decision in *Den* v. *Mitton*, has opened a fruitful source of litigation on this subject. This very case, *is a fearful commentary* upon that decision. The first question now asked, by a dissatisfied party, is, " did the testator *actually* write his name in the presence of the witnesses ; " and will, or no will is to depend upon the frail memory of witnesses, as to whether they were actually present when the testator wrote his name. Judging from what now appears before the court, this will never would have been questioned, but for the decision of *Den* v. *Mitton ;* and yet under the influence of that decision, sustained as it has now been, by my brethren, it will not be surprising if this will, which so far as appears before the court, we must all believe was intelligently made, and actually signed by the testator, should be ultimately defeated. Believing, as I do, that an *actual writing* of the name in the presence of the witnesses, is not necessary ; that it is sufficient if the testator acknowledges his signature, and publishes the instrument as his last will and testament, in the presence of the witnesses, as was done in this case, I am of opinion that the rule ought to be discharged.

☞ The Chief Justice intended after the second argument of this cause, to have revised his opinion delivered after the first argument, but his official duties have not afforded him time, nevertheless, he so seriously dissents from the opinion delivered by a majority of the court, that he has requested the reporter to publish the foregoing opinion, hastily written by him, after the first argument.

Den ex dem. Mickle v. Matlack et al.

FORD, J.   This ejectment was brought by B. W. Mickle, as heir at law, to try whether Dr. Andrew F. E. Mickle's will, devising the premises in question, to James Matlack, the defendant, was *signed* in the presence of three witnesses, or signed elsewhere, and only *acknowledged* in their presence.   The late Mr. Justice Ryerson, before whom the cause was tried, stated in his charge to the jury, that the will must be signed in the presence of the witnesses, in order to be valid under the act of the legislature, so as to be a good conveyance of lands.   The jury found that the will was so signed.   The heir at law, moves for a new trial, because the jury had no credible evidence of the will being so signed ; that the weight of evidence was strongly against the verdict, and that justice had not been done.   On the other hand, the devisee insists that the charge of the judge was wrong : that if a testator produce to the witnesses a will already signed, and acknowledge the signature in their presence, it is a sufficient signing under the statute.   This raises an important question of law which I propose to consider, before entering into the facts of the case.

First.   I hold that the statute requires the testator to sign his name in the presence of the witnesses, and that no acknowledgment of a will, can make it good for the conveyance of lands, under our statute.   For this, I rely on the act itself.   *Rev. Laws*, 7.   It was passed the 17th *March*, 1713–14.   The following are the words of the second *section*.   " All wills and testaments which hereafter shall be made in *writing, signed and published* by the testator, in *presence* of three subscribing witnesses, and regularly proved and entered upon the books of records or registers, in the secretary's office," &c. shall be sufficient to devise and convey any lands, &c. and the books in which they are recorded, &c. may be given in evidence &c.   The operative words, " signed *in presence* of three subscribing witnesses," are a plain and positive enactment of the Legislature, which this Court has no constitutional or legal power to alter, by substituting acknowledgmnt instead of signing, in the presence of the witnesses.   This is no longer an open question.   It came directly before the Court, September Term 1830, eight years ago.   Ewing, Chief Justice in the case of Den on the demise of Compton *v.* Mitton, tried before Drake Justice, in the Sussex Circuit, who inadver-

tently fell into the construction which had long been put upon the 29 *Car.* 2, c. 3, instead of the plain words of our own statute ; for he charged the jury, that if the testator *acknowledged* his signature, in the presence of the witnesses, it was sufficient. After the point had been argued at the bar, it was held under advisement for several days at chambers, and at length decided unanimously, that the testator's acknowledgment of his signature, in the presence of the witnesses, was not sufficient ; that the terms made use of in our statute, are plain and explicit. " *Signed* by the testator, *in the presence* of three witnesses." And an acknowledgment is not an actual signing. Justice Drake became entirely satisfied of the error, and the verdict was set aside, by the unanimous opinion of the Court. 7 *Halst.* 70. If we now overthrow this decision, and set up a contrary one, in the face of it, and in the face of the plain and explicit terms of our own statute, is it likely that this new decision will stand even as long as the old one. If not, then I ask, when is this important question concerning real estates, and the validity of last wills and testaments, ever to be put at rest in New Jersey ? *Stare decisis* is the rule of law, and so essential to the repose of property, that Camden and Hardwick, Mansfield and Kenyon, Loughborough and Eldon, have bowed to it with the highest veneration. I cannot help thinking that this solemn decision of our own Court, ought to conclude the point, at least, till it shall have been reversed in the high court of Errors, or till the legislature see fit, if ever they do, to change the statute of wills. But I humbly apprehend that the decision in *Den* v. *Mitton,* will never be shaken in the court above, nor by the legislature. A will of lands, is not an instrument between contracting parties, it is the declaration of the man's own mind, no sooner executed than placed under lock and key, till the maker's death, and it is important to every family that its execution should not be uncertain, or who can tell what disposition will be made of his estate. There are but two ways in which a testator can sign his will, one is, *in* the presence of witnesses who are to prove it after his death, and the other is *out* of their presence. The legislature ought to prescribe that way which is the most certain, and they have done so, by ordaining it to be *in* the presence of the witnesses, because they will then know the facts of their own knowledge. If the testator wrote

his own name, they will know and can swear to it; if being illiterate or sick, and unable to write, he direct another person to write his name, or make his mark in their presence, they will know all about it; if there be an attempt to substitute another will, in place of that which a sick man lays on the table, some of the witnesses will detect the imposition. The certificate which they subscribe at the foot of the will, that the testator signed and published the same *in their presence,* is a true memorandum made by them at the time, from which they can swear with safety, any number of years afterward, when called upon. Every thing becomes certain, safe, true, and easy of performance. On the other hand, if the will be signed *out* of their presence, they cannot be said to know a single fact in the case; they *heard* the testator *say* it was his hand; but that is only a *hearsay,* which is the lowest and loosest of all evidence; they do not know whether he signed it, or whether another signed it for him, nor who that other was, nor whether it was done in his presence or by his order. They do not know whether the paper, to which, a very sick and helpless man acknowledges his signature, has not been substituted in place of the true one. Yet because he acknowledges it, they sign a certificate at the foot of the instrument, that he *signed it in* their presence, which is an utter falsehood, and, after some time, misleads them into a false oath before the surrogate, that they *saw* the testator *sign* the will. If the decision in the case of *Den* v. *Mitton,* is to be overthrown, the certificate of witnesses at the foot of the will must be immediately altered to run thus: " The testator *said,* in our presence, that he *signed* the foregoing instrument as his will," and then there will be no false swearing before the surrogate; they will not swear to the fact of signing, but to a *hearsay* of it. No surrogate in the state, will grant probate of the will, however, upon such a deposition; for the forms of their offices under our statute, for more than a hundred years, have required them to administer an oath to the witnesses, that they positively *saw* the testator *sign* the will; and in this dilemma, some of the witnesses must be induced to swear false, or the will must fail, after the maker is dead and gone. Such must be the unblest consequences of overturning the decision in *Den* v. *Mitton,* made in support of the plain words of our own statute, as it has been understood for more than a century, in the courts

of the Ordinary and Surrogate general, in every county in the state.

And what is the end to be attained by such a vibrating decision ; is it to save a testator from the petty trouble of writing his name *in* the presence of witnesses of his own selection, his own chosen friends, if he pleases, when it is just as easy to do it in their presence as out of it? Is it because a hearsay that he signed it, is better evidence than the fact itself? Is it, that a false certificate is better than a true one? Is it because any public benefit can result from shaking the forms as they have stood in the offices of all the surrogates, since the year 1714? No, it is for the poor purpose of making the execution of *wills*, conform to the mode of executing *deeds*, when there is no similitude between such instruments ; one being by necessity of law, the other not ; one being a contract upon good or valuable consideration with covenants, the other no contract whatever ; one a transaction between opposite and independent parties, the other a transaction of a man with himself. Why should instruments, so unlike in their nature be forced, over all the obstacles before mentioned, into similarity of execution ? If it must be done, let the analogy be followed fairly out at least. Wills are the most solemn instruments of the two, for they generally dispose of all a man's worldly substance, and if acknowledgment only is to be relied on, it ought not to be made before any body that can be picked up in the street. Boys just old enough to be sworn, apprentices in a work shop, young girls totally unacquainted with the lowest forms of business ; these are not the proper persons to take the acknowledgment of wills for the conveyance of real estates. If an analogy to the acknowledgment of *deeds*, is the thing aimed at in this novel proposal, our decision, that the acknowledgment of a will shall be valid, ought to go still further, and prescribe that it shall be so, only when taken, as in the case of deeds, before some judicial officer conversant with legal forms of business, or commissioner appointed by the legislature. The very form of acknowledging *deeds*, has been carefully settled by the legislature, and if the court should now make a law for the acknowledgment of *wills*, we ought at least to declare the proper form in which it shall be taken.

But it is said, that the construction of our act ought to follow

that which was given to the English statute of 29 *Car.* 2 *ch.* 3. on the same subject. To this, I can never agree. The statute of Charles, was created in original righteousness, but did not keep its first estate. Soon after it was made, the judges of that day, corrupted it by misconstruction, and its fall brought ruin in its train. It was intended to make the testator sign *in the presence of the witnesses ;* for it provided that all wills "should be *signed* by the testator, and *attested in his presence,* by three or four credible witnesses." What were the witnesses to *attest* (which means, bear witness to) but the act of *signing ?* Lord Holt in after times said, " the amount of the words is, that the *signing* shall be *in the presence* of the witnesses ;" he said, "'tis plain, that they are to *prove the signing,* which they cannot do unless they are present; that it is the same as if the words had been, that the will must be signed in the presence of the witnesses." *Lea* v. *Libb, Carth.* 35 ; *S. C.* defectively reported in 3 *Mod.* 262. Yet the early judges in the 33d year of that profligate reign, gave a construction which did away with the *signing in presence,* and allowed a bare *acknowledgment* of signing, to be sufficient; and now an acknowledgment of a will *in the street,* or through a *broken window,* or by the testator seated in a carriage standing in a thronged street, made through a shop door or window, to a person inside of the shop, is become the mode of taking the acknowledgment of these solemn instruments called wills, in England ; and though Holt condemns the adjudged cases on which this misconstruction rests, and all the great judicial characters since his time, condemn this misconstruction, and deplore the evils riveted upon them by an abuse of the meaning of that statute, yet that vicious construction is now pressed upon us, although our legislature afterwards in passing the present act, *rejected* the words used in the statute of *Car.* 2. for the express purpose, as I believe, of getting clear of that pernicious construction, and substituted in their place, the words " *signed in the presence of three witnesses,*" so as to leave no construction to operate upon. I cannot consent to revive the old exploded construction which was given to the English statute, and admit it at this day, to have greater weight in New-Jersey, than the plain words of our own legislature.

In further support of that exploded construction, it is argued

that, in the case of *deeds* if the grantor only *acknowledge* to the witnesses, that he executed it, they subscribe an attestation that he " *signed, sealed, and delivered* it *in* their presence." There are some errors and inaccuracies in this statement; that require to be corrected. It is the sealing and delivery which constitute a deed, and the mode of attestation at common law is only "sealed and delivered in presence of us; " the word " signed " does not belong to it, and is matter only of awkward surplusage. But there is another and much greater mistake. The witnesses do not subscribe this attestation of " sealed and delivered in presence of us," upon any acknowledgment. The very *acts* of sealing and delivery are *done in their presence.* The seal of wax or wafer being prepared, the grantor seals it with his own finger, and then gives it up, or lays it down, for the other party ; which acts of sealing and delivery, are actually done and performed *in the presence of the witnesses.* This is the legal mode known and observed by all men of business. It is the common law mode, and there is no hearsay about it, except what is said concomitantly with the doing of those acts. The witnesses see the acts performed in their presence, and can swear to them positively, when afterward called upon in pursuance of the memorandum made and subscribed by them at the time that the deed was *sealed* and *delivered in their presence.* And the execution of *wills*, can bear no analogy to this of deeds, unless the witnesses *see the signing* of the wills as they see the sealing of the deeds with the finger.

A custom is said to be prevalent in this state, for a testator only to acknowledge his signature, and if the literal meaning of the statute be enforced, as it is in the case of *Den* v. *Mitton*, it will bring destruction on a great portion of the unproved wills in the state. This argument supposes we have power to abolish an act of the legislature, whenever we think the execution of it will be attended with evil consequences ; it supposes that the universality of a bad practice, may set aside a good law. One is hardly prepared to adopt such a dangerous doctrine as this. At any rate, the universality of the practice ought first to be established in the clearest manner : yet where is the proof of it. As far as my practice ever went, I do not call to mind a single case in which the will was not actually signed by the testator in the presence of the witnesses. Other gentlemen have told me the same

of their recollection. That instances of carelessness, may have occurred, is not unlikely. But I am an unbeliever in the universality supposed, for many cogent reasons. The terms of the statute are so plain and express, that no man who reads, whether professional or unprofessional, can mistake them, if he tries. The surrogate offices throughout the state, have never misunderstood the act; the witness to every will of lands for the last hundred years, has *sworn* in those offices, that he *saw* the testator *sign* the will, and that it was done in the presence of the other two witnesses; and what greater evidence of the universal observance of the law than this, can be required? The very form in which wills have been attested for a hundred years, shows the universal understanding of the statute to be correct; the customary form has always been, "signed and published by A. B. as his last will and testament, *in the presence of us.*" This is the strongest evidence that can be adduced of a general conformity to the statute throughout the state; and I cannot consent that a few cases of careless or inadvertent practice, shall overcome the great and prevailing mass of contrary evidence.

Again, it is argued, that if our statute be taken literally, the preamble will be incompatible with the clause confirming wills made prior to the date of the act. If this were true that they could not stand together, it would only follow that the preamble must be rejected, not the law, for the preamble is no part of the law which does not commence till after the words "Be it enacted." But there is no incongruity until one is first created by means of the old false construction before mentioned, which it was the very intent of our statute to explode, and abolish. The preamble recites, that it had been difficult in previous times, to get more than two witnesses "to be present at the *signing* of wills;" clearly showing that the act of signing used to be done *in the presence of the witnesses;* for "*present at*" the signing, cannot possible mean *absent at* the signing. So far they are compatible. The preamble recites in the next place, the old law of 1682, from *Learning* and *Spicer*, 236 *sect.* 20, that "all wills in writing, *attested* by two credible witnesses," &c. should be valid; and as the word "attested" was misconstrued in the time of *Car.* 2d, to mean *acknowledged* in their presence, therefore it contradicts the enacting clause for confirming wills formerly *signed in*

*the presence* of two witnesses." It all depends on the true meaning of the word "attested," which according to the old judges under *Car.* 2d. was misconstrued so as to favor acknowledgments; but lord Holt, and all the eminent English judges in modern times, deplore it, and hold that witnesses could not *attest*, (which means, bear witness to) a *signing*, unless they were *present at it.* And as this is the true meaning of the word *attest*, let it be understood as it is, and there will be a perfect congruity between the preamble to the act, and all the clauses in it. Every clause in each of them, means "signed *in the presence* of the witnesses."

It was said on the argument, that if the act be taken literally, a will of mere personal estate, will be void, unless executed in the presence of *three* witnesses. How an act confined expressly to wills, for the conveyance of "*lands* and *tenements*" can be extended to wills, for the conveyance of mere *goods* and *chattels*, was not attempted to be shown, and therefore the argument requires no answer.

But Judge Washington was cited, to prove that the execution of wills in New-Jersey, was according to the 29 *Car.* 2. *ch.* 3. In this he was under a mistake about the laws of our State. The English statute, so far as respected wills, was "never practiced in this colony;" and therefore was never extended here, by the 22d section of our constitution. The English statute was passed in the year 1677, and in 1682, only five years afterwards, the colony made a statute of its own respecting wills; which was amended in 1714, and has continued from that time to the present. It is not possible that we were under both laws at the same time, and it is equally impossible that our law, as was argued, should be only in confirmation of the English law, which required three or four witnesses, when ours was enacted to the *contrary* of it, so as to require only two. The idea of ours being a confirmatory act, is therefore utterly inadmissible.

It is asked, how a witness is to remember after many years, that the signature was made in his presence, and how often wills must be set aside, if the witness happened to forget it. The answer is, that he gives the testator, a certificate of it under his hand, at the time of the transaction, to prevent the loss of which, the testator takes the certificate on the will itself, and after any length of time, this certificate under the witness's own hand,

makes him as sure of the fact, as a man can be of any thing that he makes a memorandum of, at the time under his own hand. No man under oath, would dare to deny, or even to doubt the fact, with a certificate of it under his own hand, staring him in the face. It is in this certificate, that the testator reposes for the security of his will. The witness may indeed not remember the fact, but there is his certificate, made at the time; and if he *dares* to deny the truth of it under oath, he will be almost fit to be convicted of perjury.

Finally, I rely on the plainness of the words " signed in the presence." There is no lawful authority for any construction, where words and clauses are all plain. Where they are contradictory to each other, or ambiguous, it is the duty of the Court to reconcile and fix their meaning by construction, for it is their only resort. But where there is no collision between clauses, nor ambiguity in words, they are to be taken in their plain sense, and this is the first, and very greatest rule in the books, for the understanding of statutes. For this, I cite the decision by Willes, Ch. Jus. in *Colehan* v. *Cooke, Willes's Rep.* 393. He says " I never understood that the *plain* words of an enacting clause, are to be restrained by the title or preamble of an act. When the words of an act are doubtful and uncertain, it is proper to inquire what was the intent of the legislature : but it is very dangerous for Judges to launch out too far in searching into the intent of the legislature, when they have expressed themselves in *plain* and *clear* words."

I have thought it not improper to say as much as I have said, in the vindication of the case of *Den* v. *Mitton,* as I am now the only surviving member of the bench when that decision was made. It was founded on the express words of the legislature, who deemed it important to all testators, and the safety of their wills, that they should be signed in the presence of the witnesses ; and they must be so signed under this statute, in order to be valid for the conveyance of lands, tenements, and real estates.

Secondly, it remains to be enquired, whether there was sufficient evidence that the testator in this case, signed in the presence of the witnesses, to vindicate the verdict against the charge of its being found without evidence, or against the manifest weight of it. My opinion is, that there is no good ground for such a charge against the verdict.

The three subscribing witnesses were Henry Freas, William V. Mankin, and James A. Lord. They were not called till about two years after their attestation, when it would not be wonderful if many of the small and trivial circumstances connected with the execution of the will, had escaped from their minds. The momentary act of witnessing an instrument, where there is no excitement to impress it on the mind, may easily be forgotten. I speak for myself, and know it will be corroborated by the experience of hundreds of others, that I cannot now recall to mind, ten out of every hundred attestations that I have made as a subscribing witness. The view of my name, and what I certified at the time, may bring to my recollection by a former association of ideas, some impression of the time and place, and leading facts, while trivial incidents attending them, I may recollect not at all, or imperfectly, or even erroneously, from a clouded mind.

William V. Mankin was first called to the witnesses' stand, and he testified to every thing contained in the attestation to which his name was affixed; that the signature was his hand; that he knew Dr. Mickle the testator; that he saw the Doctor sign his name and publish it as his will; that he signed it in the presence of the witnesses, Henry Freas and James A. Lord, and that they three subscribed their names as witnesses. Now this was full proof of the execution of the will, under the statute, according to each of its requirements, and nothing more was necessary to establish it. The Surrogates admit a will to be fully proved, and to go into a record, upon the oath of only one of the subscribing witnesses, if he proves all that the statute requires; for though it requires three subscribing witnesses, it does not require all three to be sworn. Some of them may be dead, or insane, or removed out of the jurisdiction of the Court, or to places unknown. It was settled in the case of *Longford* v. *Eyre*, 1 *P. Wms.* 741, that it is sufficient if *one* witness proves the full execution of a will. Here then was evidence enough to found an honest verdict upon, and vindicate it from the charge of being found without evidence. To overcome the testimony of this witness, the heir at law was driven to impeach his credit; he shewed that Mankin at the time of his attestation, was a hired laborer in the employment of Mr. Matlack, the devisee; that he

busied himself in talking to James A. Lord, the other witness, about his recollection, and reminded him of what he had already sworn to before the Surrogate; and endeavored to prove that Mankin had said he would stick to Matlack through thick and thin. These matters were laid fully before the jury, in order to discredit him; but after fully weighing his credit, they believed him, and found a verdict in favor of the will, upon this plenary evidence. What then can be the use of a new trial? Has this witness retracted any part of his oath, or will he now swear to material facts which he did not before recollect? No, if he is to be believed, it settles the cause, and the sole object of asking for a new trial, so far as respects this witness, is to try his credit over again, before another jury. But a new trial was never granted, on the contrary it has always been refused, merely to try over again the credit of witnesses. The allowance of it would render litigation interminable, as long as one more witness could be brought on the point of credit. This matter was pointedly put to the jury, by the direct charge of the judge before whom the cause was tried. If the plaintiff had any more evidence of discredit, he ought then to have adduced it; if he had stronger arguments, he ought then to have used them, for he can never allege the discredit of a witness, as a ground for new trial, after he has once tried the cause on that point. My positions then are, that one witness has proved the execution of the will in every particular according to the statute; that one witness is all the law requires, and that if his credit be assailed on the first trial, and established by the jury, a new trial can never be granted to try his credit over again. As I hold each of these positions to be unanswerable, they make an end of this case, and the motion for a new trial may be safely refused, without any further discussion.

But this conclusion is doubly fortified by the testimony of James A. Lord, another of the subscribing witnesses. He also swore that he *saw* the testator *sign* the will, and publish it in *the presence* of William V. Mankin, Henry Freas and himself; and that the three persons subscribed their names to it as witnesses. He was a youth of unusual timidity, who appeared to give evidence in Court, for the first time in his life; and though he was kept on the stand an uncommon length of time, and cross-

examined by counsel till he fainted away, he still, as with his dying breath, adhered to this statement. He was called three different times to the witness's stand. He appeared very honest, and at the first examination declared repeatedly that he did *not* recollect seeing the testator *sign* the will. On being dismissed from the stand, he took a seat by the stove and sat for a time in deep and solitary thought, communing with himself, or as one of the witnesses expressed it, "looking down his nose." While in this state, Mankin came up to him and said, "don't you remember that Dr. Mickle signed the will?" To which he immediately replied, "I do; it came fresh to my recollection while sitting here, before you asked me." Mr. Matlack the devisee on learning this, immediately went and told him if he now remembered it, he had a right to be called again, and declare it, and that it was his duty to do so. He was called and then testified fully to his recollection. He was then cross-examined and got very much confounded in respect of trivial circumstances, as where he stood, where the testator stood, where each of the other two witnesses stood, where the pen and ink stood, who signed first and who last; and then who had talked with him, where he had been, who went with him; all trivial and immaterial circumstances, as to which, he became exceedingly confused and finally fainted, yet no process could shake his firmness in the main facts that he did see the testator *sign* the will *in presence* of the three witnesses. Under these circumstances, and some inconsistencies about trivial matters, his *credit* was vehemently attacked by counsel, and the judge himself put the credit due to his testimony, directly to the jury. But they evidently believed him to be an honest though timid youth, and therefore found that the will was signed by the testator in the presence of the three subscribing witnesses. Who can doubt but he swore to the truth? He had signed a certificate of the truth of the facts, at the very time they took place; he had afterward sworn to the same, before the surrogate, and he now swore to it again from his own recollection. The only object of a new trial so far as relates to him, would be to try his credit over again, before another jury which is a thing prohibited by the settled principles of law.

But it is said that Henry Freas, the third witness, does not recollect the fact of signing by Doctor Mickle. Suppose he has

lost the impression of it, after two years; testators may justly tremble for the safety of their wills, if they may be destroyed by the forgetfulness of one witness, when there are two who remember it. If this principle can be judicially maintained, wills are not only the frailest instruments known to the law, but testators may as well relinquish the great privilege of making them. But Mr. Freas goes further, it is argued, than non-recollection, he *denies* under oath, that Doctor Mickle signed the will in their presence. It is to be hoped that he is an honest man in other respects, but about this matter, his credit too, was left to the jury, and they did not believe a word of his denial. Two years ago, he had given a certificate under his hand, that he then *saw* Doctor Mickle *sign* the will; and now he swears that what he then certified under his hand, was all a lie! The man's oath is not only contradicted under his own hand, but positively by two other witnesses. What person disposing of his wordly substance, to those who are dearest to him, would dare trust a man to witness his will, who had once given a certificate under his hand, to a confiding testator, that he saw him sign the will, but afterward under oath, and without assigning any reason for it, denied the truth of his own certificate under his own hand? One thing is certain, that no *prudent* man will ever call him again to witness a will or any other important instrument. It put his credit down before the jury, and if the object of a new trial is to retrieve his credit before another jury, I am free to declare, for the universal security of testators, that it ought not to be granted. This will was in my estimate of the evidence, doubly proved by two subscribing witnesses, either of whom would have been sufficient, and both of whom were found irresistible by the jury; and the justice of the case is so manifestly with the verdict, that I feel no hesitation in saying that the rule for a new trial ought to be refused.

DAYTON, J. This case was tried before a special jury at the Gloucester circuit of March 1837, who rendered a verdict for the defendants. It involves solely the question of the due execution of the will of Doctor Andrew F. E. Mickle, deceased, under which the defendants claim adverse to the rights of the lessor of the plaintiff, his heir at law.

Den ex dem. Mickle v. Matlack et al.

Justice Ryerson, among other things, charged the jury, that proof of an acknowledgment by the testator, of his hand and seal, in the presence of the witnesses, was not a sufficient execution of the Will : that they, or some one of them, must prove that they actually saw him sign, or were in a situation to see him, if disposed so to do.

On the argument of the rule to show cause, it was insisted upon the part of the plaintiff, that the verdict was against the weight of the evidence, and the charge of the court : and on the part of the defendants, that the charge of the court was erroneous.

There does not appear to have been any question made at the trial, as to the terms of the will, or the sanity of the testator. The only point disputed, was the *form* of its execution. Was it signed by the testator in the presence of the subscribing witnesses ? or was it signed elsewhere, and the mere *acknowledgment of signing* made in the presence of the witnesses ? This was the disputed question presented by the evidence, and submitted to the jury. That jury by their verdict, have said that it was signed in the presence of the subscribing witnesses, and thereby they have given effect to the will. The plaintiff asks for a new trial, that he may again controvert merely the formal execution of this will, and if possible avoid it by reason thereof.

It would require a strong case before this court, in the exercise of a sound discretion, should listen to such an application. A much stronger case indeed, than is in my judgment, presented by the evidence.

Mankin, one of the subscribing witnesses, swears explicitly and directly to the fact that the will was signed by Dr. Mickle, in the presence of himself and the other two witnesses who have attested its execution. That immediately before signing it, " he held the paper up in his hand—said it was his last will,—opened it, and signed it "—and to this statement, he adhered throughout.

Lord, on his original examination, said he did not remember to have seen Dr. Mickle sign the will, though upon being recalled, he testified that he did : but the somewhat extraordinary circumstances attending his re-examination, induced the Judge who presided at the circuit, to tell the jury that they would be justified in laying entirely out of the case, all that he said on his second examination. His credit, however, was left to the jury,

and they may have believed him, as they had an undoubted right
to do.   If so, the weight of evidence was every way in favor of
the will.   But supposing that Lord's evidence were wholly re-
jected, still the evidence of Mankin remained, and was amply
sufficient, if the jury believed it, to support the will.   They have
believed it, as appears by their finding, and I can see no possible
cause to disturb their verdict.

His testimony was positive in its character : that of Freas,
the other subscribing witness, and Miller who was present,
though not a subscribing witness, was negative.   The one swears
to what he did see, the others to what they did not see.   It is true
they swear that the will was not signed in the presence of the
witnesses; but this rash mode of swearing, does not alter the
legal nature of the evidence, which is positive or negative in its
character, according to the facts sworn to, and not according to
the phraseology of the witnesses.

There may, perhaps, be a case where negative evidence may
be as strong as positive ; as if two persons were placed beside a
clock for the express purpose of saying whether it struck at a
particular hour, and it was proved that the attention of both were
equally directed to it at the precise point of time, but there is no
proof of such equality of attention here ; on the contrary, Miller
does not even recollect that Lord, the subscribing witness was
present at the transaction ; and surely the mere act of signing
the will, was much more likely to have escaped his notice, or at
this distance of time, his memory.   The credibility of Mankin
and Lord, was distinctly put to the jury, and I cannot say that I
am at all dissatisfied with their verdict.

But admitting that it was clear by the evidence, that the will
was not actually signed in the presence of the witnesses, it is in-
sisted upon the part of the defendants, that the acknowledgment
in their presence, of such signing is sufficient, or in other words,
that the charge of the Judge at the circuit, and the case of *Den*
v. *Mitton*, 7 *Hal.* 70. is not law.   Though averse to the expres-
sion of an opinion on any point not expressly required for the de-
cision of the case, yet the fact that a second argument has been
had, (the first was before I came upon the bench) particularly in
reference to this question, appears to demand it here.   To avoid
giving it, might subject me to the imputation of intentionally
avoiding the important question in the case.

Without meaning to intimate what would have been my course, if the construction of our statute were under consideration for the first time, I will say in brief, that I am disposed to abide by the law as laid down by this court, in *Den* v. *Mitton.* Chancellor Kent deprecates in strong and just terms, a course of mutable legislation, and certainly the evils of mutable judicial decisions, are equally to be lamented.

Were we now to deny the law of that case, the whole question would remain unsettled, to be mooted again, as soon as the face of this bench shall have been changed. I am aware there have been doubts entertained at the bar, as to the soundness of the construction of our statute, as adopted in that case; but there is no middle ground which we can occupy, and I think, there are few who would be willing upon reflection, to go back wholly to the English decisions, which, step by step, have frittered away their statute. Although its language required the will to be signed by the devisor, and to be attested and subscribed by the witnesses in his presence—evidently contemplating *one transaction,* and the presence of all the witnesses, as a check upon each other, for the protection of the sick and infirm ; yet by the English decisions, the signing, the acknowledgment, and the attestation, may all be at different places, and at different and distant intervals of time, (covering the testator's whole life) and before the witnesses severally, who may never more see each other; thus forming an issue upon questions of testamentary capacity, at three distinct points of time, without the joint judgment of the subscribing witnesses, upon the question, at any one of them. There are difficulties enough involved in these questions, even under the form prescribed in *Den* v. *Mitton.* I am not willing to increase them. It is safest to stand by the decision heretofore made in this court, and if it be too rigid in its requisitions, let it be remedied by legislative enactment.

Were it past a doubt, that the construction given by the profession to our statute, and the practice under it, from its passage in 1714, to 1830, were uniform and the same as given to the statute, 29 *Car.* 2, *Ch.* 3, *sec.* 5, it would have had in my judgment, the force of judicial decision : but of this uniformity of construction, and universality of practice, I have no knowledge, and speak of it wholly with *a protestando.* Had it been so well

and so universally understood, as contended, it is strange that in *Den* v. *Mitton*, the judge at the Circuit should have reserved his opinion upon our statute, until the case should be argued at bar : and when argued here, it is passing strange, that it entirely escaped the notice and comment of the late Chief Justice Ewing, who in his own long and extensive practice, must frequently have been led to professional action under the very statute in question. The inference is fair, that he and his associates (all of much experience) did not consider the practice and construction a settled thing, either by long usage, or judicial decision. And I may add too, that the late Justice Ryerson is understood to have approved of that decision. In view of these matters, (notwithstanding what is said by Judge Washington, in *Stephen's and White* v. *Vancleeve*, 4 *Wash. C. C. R.* 269) I cannot forbear a doubt as to the uniformity and universality of the alleged practice under our act of 1714.

Apart from any practice to the contrary, I think that the argument in favor of the construction adopted in *Den* v. *Mitton*, is conclusive. For comment upon the meaning and force of the language of our statute, as differing from the English act, I refer to that case. I do not intend to repeat what has been there said, or to refer to the authorities there cited. It has been well observed, that the construction given by the English Courts, to their statute, 29 *Car.* 2, *Ch.* 3, " departed from the strict construction and obvious meaning of the statute of frauds, and opened a door to very extensive litigation," 4 *Kent* 515. And yet, that statute does not like ours, require that the will should be signed by the devisor *in the presence* of the subscribing witnesses ; but it does require that the witnesses shall attest and *subscribe in the presence* of the devisor, and the English Courts have always adhered strictly to that requisition. Or in other words, they have construed the language of our act in this respect, exactly as we have done.

Again the 6th *section* of the British statute, prescribes different modes of revoking wills, and among others, by a writing " signed in the presence of three or four witnesses." And the language of this last clause, in reference to revocations, the English Courts have always held, as requiring not an acknowledgment merely, but an actual signing in the presence of the witnesses.

*Grayson* v. *Atkinson,* 2 *Ves. Sen.* 454, 458 ; *Ellis* v. *Smith,* 1 *Ves.* 12, 16. So that we see the words of our act, are held so potent in Westminster Hall, that to revoke a will by any other writing (than a will or codicil) requires a different and more guarded ceremony, than to execute one. Here is a second instance in which the English Courts have construed the language of our act, as we have done.

Again, I think that it may fairly be inferred (from the change in phraseology) that the Colonial legislature intended that our act should have a different construction from the English. Soon after the passage of the statute, 29 *Car.* 2, a disposition was manifested in their Courts, to fritter away its force. *Lemyn* v. *Stanly,* 3 *Levintz* 1, was decided shortly after : and before the passage of our earliest act upon the subject of executing wills. That case went so far as to dispense with signing altogether, if the paper contained the testator's name, and was in his hand writing. The Legislature of this Province, however, in 1682, *vid. Leaming and Spicer,* 236, enacted the statute referred to in the preamble to our act of 1714, in which are used substantially, the words of the English act. It was intended to validate wills attested by two credible witnesses, &c. if registered in the Secretary's office, within this province, within forty days after the testator's death. A further act was passed on this subject, in 1698, (*Leaming and Spicer,* 371) which validated " all wills in writing, and attested by three or more credible witnesses " &c. if proved and registered in the public records, within sixty days after the testator's death. The next act was that passed in 1714, *Rev. L.* 7 ; first found in 1*st Nevill's Laws,* 37, and from which it appears to have been accurately copied. This act was intended, as its title and preamble show, not only to confirm wills made under the act of 1682, but such other wills as might thereafter be made in the manner therein prescribed. And here for the first time, we find the Legislature of this province, departing wholly from the language of the statute of wills, 29 *Car.* 2, and requiring, not that wills shall be signed by the devisor and attested and subscribed in his presence &c. but that wills thereafter made, shall be " signed and published by the testator in presence of three subscribing witnesses." I say requiring, prescribing this ceremony, because unless this act does give the ceremo-

ny, *there is none other that does.*   The statute of 29 *Car.* 2, and this act, could not have both been in force on this same subject, at the same time, and as far back as 1799 ; the English act was expressly repealed.   Upon the passage of our statute in 1714, the loose construction which the English Courts had put upon their act, was well known and perhaps already regretted.

The words " signed in the presence of," had been twice used in their statute, and a more guarded construction in both cases applied.   When therefore the penman of our act, was drafting the *second section,* he rejected those words of the fifth *section* of the British statute, to which so loose a construction had been given, and substituted in lieu thereof, the words of the sixth *section* of that statute, " signed in the presence of " and to which, Courts gave a construction variant from that given to the fifth *section* of their act.

It is a rule adopted by the English Courts, in construing their statutes, that " words and phrases, the meaning of which in a statute has been ascertained, are, when used in a subsequent statute, to be understood in the same sense."   4 *Bac. Title Statute Lett I. p.* 644.

Is not the conclusion irresistible, that the provincial Legislature, in adopting the same language, intended to require the same ceremony to execute, as was required to revoke a will ?   If that were not their intent, I ask emphatically, what was intended by the change ?

Again, if we hold an *acknowledgment of signing,* to be a sufficient execution of a will, we involve ourselves in this absurdity.   We have in substance re-enacted the sixth *section* of the British act, in reference to revocations.   *Rev. L.* 224, *sec.* 2.   By this act, a will may be revoked among other modes, by some other will or codicil in writing, " or other writing of the divisor, *signed in the presence of* three or more subscribing witnesses, declaring such revocation or alteration.   Now the English decisions, as before observed, have held this last clause to require an actual signing in the presence of the witnesses, and we, following those decisions, and the plain meaning of the act, must do the same.   Here then we have in the statute book, two several acts in the same language—upon the same general subject—the one prescribing the form for executing, and the other for revo-

king wills, and to which, an entirely different construction would be given ! It appears to me that this view of the case manifests strongly the propriety of adhering to the construction of our statute, heretofore adopted by this court.

There is certainly some doubt thrown upon the proper construction of the second section of our act, by the language of its preceding parts; if we assume that prior to its passage, the form of executing last wills, was agreeable to the decisions on the statute of 29 *Car*. 2. The preamble appears to use the words "attested by two credible witnesses," as signifying, being present at the execution; but I am not disposed to rely much upon any argument drawn from the phraseology of this preamble, (which has nothing to do with any thing, save the first *section* of the act.) It is like most preambles, loose in its structure, and illy considered in its language, 1 *Kent, C.* 460. Inferential matter appears upon its face, which if true, so far from favoring the defendants, would be destructive to their whole case. It recites, that whereas, &c. it had been "difficult to get more than two witnesses to be present at the signing, *sealing* and acknowledging of last wills, &c. Now if that were the mode of executing wills, prior to the passage of the act of 1682, it could not have been by virtue of the statute of 29 *Car*. 2. (which required no *sealing*,) but by some local custom or law, of the province, existing prior to that time, and of which, we have no trace. Yet the whole argument of the defendants, is based upon the supposition that, prior to the act of 1714, the form of executing wills, had always been agreeably to the British statutes and decisions; and that our act of that date, was not intended to alter it. From the latter part of the preamble, however, it would appear, that it was intended to confirm such wills as had been *signed*, &c. merely, and this I presume is all that had been necessary. It shows at all events, the utter looseness with which this preamble is drawn, and the little reliance to be placed upon any argument drawn from its phraseology. But, it is not the preamble only which creates difficulty. The first section enacts that all last wills heretofore made, "signed by the testator in the presence of two subscribing witnesses, &c." shall be held good, &c. and yet the object of this section was to confirm wills attested by two subscribing witnesses, or executed agreeably to the English decision on their sta-

tute as is contended. This presents a difficulty, from which it is not easy to escape, if the execution under the act of 1682, might be by acknowledgment of signing in the presence of the witnesses, as under 29 *Car.* 2. and which is more than probable. But if under that act, the form of the execution was agreeably to the natural signification and requirements of its words, as held even in the English cases, then the wills executed under the act of 1682, were signed in the actual presence of the witnesses, and the first *section* of the act of 1714, confirmed such as were really intended to be embraced within it. But, be this as it may, there are in my judgment, still greater difficulties growing out of a dissent to the doctrine in *Den* v. *Mitton.* That decision having been made, it is best, in my opinion, to abide by it.

NEVIUS, J. This is an action of ejectment tried at the Gloucester Circuit, in March Term, 1837, and a verdict rendered for the Defendants. The Plaintiff seeks by his present application, to set aside this verdict, for the following reasons assigned.

1st, That is against Law;

2nd, Against Evidence;

3rd, Against the Charge of the Judge who tried the cause;

4th, That the Jury misapprehended the Charge;

And 5th, That the Verdict is erroneous.

If these reasons, or any of them are true, the plaintiff has presented a case to justify us in granting a new trial. The parties exhibit on the present argument, a state of facts proved on the trial, and also the charge delivered to the Jury. From this it distinctly appears that Dr. A. F. E. Mickle was the owner in fee simple, and died seized of the premises in controversy, on the 17th of December, 1835; leaving the lessor of the plaintiff, his only surviving brother of the whole blood, and his sole heir at law. That the defendants in their defence to the action, set up and produce a paper purporting to be a last will of Doctor Mickle, and to be attested by three subscribing witnesses, under which they claim the premises. It is not disputed that this paper was signed by Dr. Mickle, and that he was capable of making a will, when this purports to have been executed; nor is it doubted that there were three persons who signed the instrument, as subscribing witnesses; and that they were all competent witnesses.

Den ex dem. Mickle v. Matlack et al.

But inasmuch as there is a discrepancy in their testimony, as to the actual signing of the instrument by the testator in their presence, and it has been strenuously contended by the counsel for the plaintiff, and has been as strenuously denied by the defendants, that such actual signature in presence of witnesses, is essential to the legal execution of a will under the laws of this state, it becomes necessary to examine and decide this question. The law regulating the form and ceremony of devising real estate, in this state, was passed by the colonial legislature, in 1714; and strange as it may appear, I find no judicial construction of that law, until the case of *Den* v. *Mitton*, (7 *Hal.* 74.) decided in this court, in the year 1830. In that case, the question was distinctly presented, "whether the actual signature of the testator in the presence of witnesses," was necessary under our act; and as distinctly decided by the whole court. We might therefore, rest the case upon that decision, were it not that it was one of the first impression, and its reasoning and authority disputed, on the ground of its alleged variance from the *received* opinion and practice under that act, and as was also contended, tended to unsettle the law as understood and practiced in this state, prior to that time. These arguments are entitled to respectful consideration, and this court is pressed into a careful examination and review of the case above referred to, in order that the construction of the statute, may be finally settled, as far as the authority of the court can settle it.

The act of 1714, seems to have been designed to confirm certain wills made between the year 1682, and the time of its passage, which had been "attested by two witnesses only;" and also to prescribe a rule for the execution of wills, thereafter. And by its second section, provides, "That all wills and testaments which shall hereafter be made in writing, signed and published by the testator 'in the presence of three subscribing witnesses,' and regularly proved and entered upon the books of records, or registers, in the secretary's office, or any proper office for that purpose, shall be deemed and taken, sufficient to convey and bequeath lands and other estates." The validity of wills to convey or devise real estate, depends upon their conformity in their execution, to this statute, and in seeking its legal construction and meaning, it is proper to enquire

1st, What was the law of New-Jersey, prior to the passing of this statute; and what the judicial construction given to that law. And

2nd, Whether the Legislature, by this statute, changed that law, not only in its terms, but in its meaning; and designed to establish a new and different rule.

The statute of 29 Charles, 2. called the statute of frauds, passed in 1676, was in force here, when the statute of New-Jersey was passed, except so far as its operation may have been abridged by the act of the province of East-Jersey, in 1682, which appears to have been adopted as a temporary expedient, to avoid the inconvenience of a strict compliance with the former statute; and was not recognized as a repeal of that statute. By the fifth section of the statute of frauds, it was provided, that "all devises and bequests of lands devisable, shall be in writing, and signed by the party devising the same, or some other person in his presence, and by his express direction, and attested and subscribed in the presence of the devisor, by three or four credible witnesses." Soon after the passing of this act, but at what precise period, I am unable to determine, it became the subject of judicial examination and construction; and among other questions raised and determined, it was adjudged, "that an attestation made by the witnesses respectively, at different times, *if in the presence of the testator,*" satisfied the requirements of the statute. The leading cases wherein this construction was adopted, were those of *Cook* v. *Parsons, Pra. in Ch.* 185; and *Jones* v. *Lake,* 2 *Atkyns,* 176. which were followed by numerous others sustaining the same doctrine; rather upon the force of authority however, and upon the principle of *"stare decisis,"* than from the reasons given, or from any fair rule of interpretation. The reason assigned for this construction, was, "that the statute did not in express terms require that the actual signature of the testator should be in the presence of the witnesses." And the courts reasoning from analogy to other cases, seemed to forget that the legislature meant to throw around this mode of conveyance, stronger guards, than in ordinary cases; and to protect the rights of the heir at law, against frauds and impositions which were more likely to be practiced upon the passions, prejudices or imbecilities incident to that period of life, when men usually think of making such settlements.

It was a construction however, that from the earliest period, met with strong and decided opposition ; and notwithstanding the numerous decisions upon the point, that opposition was not withdrawn until more than a century after the passing of the act. This opposition was sustained by men who ranked high in the judicial history of the country from which we derive our institutions, and by reasons which in my opinion, must have prevailed, had it not been for the force of earlier judicial *authority.* Roberts in his treatise upon this statute, remarks " that this point seemed to exist in some doubt, for a long time after the statute was passed. And Phillips, in his treatise on evidence, 381, says that although an attestation and subscription by all the witnesses at the same time, would be the best security against fraud and imposition, by making each a check upon the other, yet in the interpretation of the statute, courts early determined and it is now the settled rule, that the witnesses may subscribe at several times. In support of the objections urged against this construction, Chancellor Kent in his commentaries, observes, " that the English courts, from a disposition to favor wills, departed from the strict construction and obvious meaning of the statute of frauds, and opened a door to a very extensive litigation ;" and he cites this very case, as an instance of such departure. And the remark of the Chief Justice, in *Den* v. *Mitton,* that this construction was not adopted by the English courts without hesitation and opposition, is fully sustained by reference to the case of *Ellis* v. *Smith,* 1 *Ves.* 91. In that case, all the judges declared, that if the question had been *res integra,* they would have doubted whether the testator's admission of his signature, was a proper execution of the will. And it was then held that such admission tended to weaken the force of the statute, to let in inconveniences and perjuries, and destructive to those barriers erected by the statute, against frauds and perjury. Yet notwithstanding these objections, the court felt compelled to yield to the force of authority. Such then, seems to have been the settled construction upon this point of the statute, at the passing of the act of 1714, the correctness of which, however, was at that time, and both before and since, seriously doubted. In regard to the signature of the witnesses, the fifth section required that it should be in the presence of the testator. Under this clause it was held, that there must be an actual signing by them in his

presence, or at least where he might see them sign, 2nd *Salk.* 688; 3d *Ib.* 395; 1st *P. Williams,* 239; and 1st *Bro. Ch. R.* 99. Nor is there a single case to be found, where such a signing was dispensed with, or where " an acknowledgment by the witnesses to the testator, of their hand writing to the attestation, was held a compliance with the statute. And Roberts in his treatise before referred to, says, " it seems plain, that to hold such acknowledgment to be sufficient, would be in direct opposition to the words of the statute : that this part of it precludes the same latitude of construction, which had been applied to the testator himself. *Rob. on Frauds,* 432." In further illustration of the correctness of this last position, and to prove that in the estimation of the courts, the words " signed in the presence of" were susceptible of no other legal construction, than an actual signing in the actual presence, we find that when courts came to expound and construe the sixth section of this statute of frauds, which relates to the revocation of wills, to avoid the legal absurdity of determining that the legislature intended a different ceremony in revoking a will, from what was required in the execution, as before determined, they were driven to the necessity of adopting a strained and unnatural construction, not warranted by any known rule of interpretation. Not being able to avoid the force of the language used in this section, they referred the words " signed in the presence of" to the words " other writing," and not the words " other will or codicil," though used in the same clause, and connected in such way, as to continue the sentence ; thereby declaring that the phrase " attested by three subscribing witnesses," and " signed in the presence of three subscribing witnesses," were not convertible, and that the latter was not susceptible of the same construction already given to the former.

We have thus ascertained, not only the terms of the law which was in force in this state, in the year 1714, but the construction which the courts of England had given to that law, and the meaning they attached as well to the phrase " attested by three subscribing witnesses," as to the phrase " signed in the presence of three subscribing witnesses."

The next enquiry then is, did the legislature of New-Jersey, by their act of 1714, prescribe a new and different rule in terms relative to the *execution* of wills : and did they understand the

import of the terms used, and intend by that act to alter the law? That the language of our statute, differs from that used in the statute of Charles 2d, is manifest by a comparison of the two. This requires that the will be signed by the testator, " in the presence of the witnesses." The other that it be " attested and subscribed by the witnesses in his presence." And both require that the testator shall *sign*. The language of our act is plain and explicit, as remarked by the Court in *Den* v. *Mitton;* and I may add such as never did receive the same judicial interpretation, as was given to that used in the English statute. When the Legislature therefore, whilst acting upon the same subject, employ different terms from those used in the former law, it is not only fair to infer, but is due to them, to infer that they acted intelligently upon the subject, and understood the legal import and meaning of the words used ; and that they intended to convey the very idea which such terms would naturally convey. And in the present instance, when it is considered, that the two phrases " attested by witnesses," and " signed in the presence of," had each received a judicial construction, and that that which was given to the former, had been subject to severe criticism and strong objection, it would be unjust and unreasonable to suppose, that the legislature adopted the use of these terms, by accident, or through ignorance of their true meaning. Yet it has been strenuously insisted that the legislature did not intend to change the rule on this subject ; and we have been referred to the preamble of our act, to prove that they attached to these phrases, the same meaning. If it were true that in the preamble, they were used in the same sense, it would not warrant in my opinion, a construction against the natural and accepted import of the words used in the act. It is a settled rule, that when the terms of the enacting clause are clear and positive, the preamble cannot be resorted to, for the purpose of giving them a different construction. Lord Ellenborough in 3d *East.* 165, remarked, " I see no reason to resort to the preamble, to restrain the common import of the words used." But to my mind it is by no means apparent that the legislature of New-Jersey, even in the preamble to our act, used the phrases " attested by two credible witnesses " in the same sense which the English courts had attached to them. In that preamble, they referred to the act of East-

Jersey, of 1682, where that language was employed; and in reciting it, it was right that the same words should be used, as were used in that act. But if they were used without a distinct and clear knowledge of the construction which had been given them, by courts, it is far more reasonable to conclude that they were employed to convey the same meaning as the words "signed in the presence of," do convey, and that they should be restrained by the terms of the enacting clause, rather than that the latter should be extended beyond their fair import, in order to make them conform to the former. This idea is strengthened by a reference to the language used in another part of the preamble, which recites " that in consequence of the scarcity of inhabitants, it was difficult to get more than two witnesses *to be present at the signing, sealing*, &c., implying the necessity of an actual presence of the witnesses, at the time of signing the will. To my mind it is clear, that if the legislature upon the passage of the act of 1714, were advised of the construction given to the statute of frauds, they purposely used different terms to prevent such construction of our act, or if they were not advised of it, they used the words " attested by witnesses" as signifying an attestation by witnesses, of the fact of signing by the testator.

Upon a careful examination of the law, therefore, I cannot withhold my full assent to the doctrine contained in *Den* v. *Mitton*, and declare that under the statute of this State, an *actual* signing by the testator, to his will, in the presence of witnesses, is essential to its legal execution. And believing that the Legislature intended to change the rule as to the execution of wills from what it was, and actually did change it, by the statute of 1714; I do not deem it necessary to inquire into the particular motives by which they were influenced. They may, however, be found in the objections already referred to, which were urged as I think, with great force of reason, against the construction given to the statute of frauds. As to the allegation that the decision in *Den* v. *Mitton*, went to unsettle the law in this State upon this subject, I cannot assent to its truth. I believe the practice has been very general, if not quite universal, of requiring the testator to sign in the presence of all the witnesses, and I am quite sure that few professional men, having our own statute in view, whilst superintending the execution of such

instrument, would have deemed an acknowledgment of the sig-. nature of the testator, a compliance with the law. Be that however as it may, and if my own experience has led me into a mistake upon this point, I cannot yield my own conviction of the true meaning and legal construction of that act, to any argument drawn either from the probable or necessary consequences of declaring that construction.

The next question for our consideration, is, was the law so expounded by the Judge who tried this cause? In examining the charge given to the Jury, as appears by the state of the case, I find nothing inconsistent with the view I take of the law, or any thing which would tend to mislead the jury in their investigation of the facts. It was fairly, and I believe, distinctly laid before them.

We are then left to inquire in the last place, whether this verdict is either against the charge of the court, or against the evidence upon the trial, or founded upon a misapprehension of the charge. The charge was too plain to be misunderstood or misapprehended; and there is no evidence before us, that the jury was misled by any act or opinion of the Court. Of the evidence, they were the legitimate judges; and a strong case should be presented to warrant the interference of this Court, when both parties have been fairly heard, and the facts fairly presented to the proper tribunal who have passed upon them, without the imputation of favor or ignorance. I cannot perceive that the plaintiff has presented such a case. The defendants on the trial, showed clearly that the will was signed by Dr. Mickle, that he had legal capacity to make a will, and intended to do so. And they further proved by one witness at least, that it was signed in the presence of the witnesses. If both the other subscribing witnesses had sworn that it was not signed in their presence, without being able to prove where it was signed; and if the first had not been impeached except by such contradiction, I should not have felt authorized to interpose any objection to the judgment on this verdict. The subscribing witness who was first called in this case, testified in the most explicit terms, that the will was signed in the presence of the witnesses; and the second witness confirmed his testimony, in terms equally strong, on his second examination. And although there is an important discrepancy be-

tween his first and second examination on this point, that was a matter which the jury, and not this Court, were called upon to reconcile, and they were distinctly directed that they were at liberty to reject the whole of his evidence if they considered him unworthy of credit. Whether they did so or not, or whether their verdict was in any wise influenced by his evidence, we cannot now determine. The third witness called, who was the first to sign the will, denies in terms equally strong and explicit, that the testator signed in their presence ; says he did not see him sign. Yet whilst he speaks with great certainty upon the point, he will not undertake to say that the will was signed when it was brought to the place where it was attested, and consequently cannot say that it was signed when his own name was attached to it as a witness. As he cannot tell therefore, whether the testator signed either before the parties met or after they had separated, it would follow that he could not be very certain that it was not signed in their presence. He however is sustained by the evidence of Mr. Miller, who is admitted by all the parties to have been present at the transaction. Yet Miller could not swear that Lord was present, when all the evidence shows that he was, and took part in the transaction. It may well be asked how this witness could testify in positive terms, that the testator who was present, did not at that time sign his name to the instrument, when he cannot even recollect that one of the witnesses who did then sign his name to it, was present or not. But these were considerations for the jury ; they have pronounced upon the questions, and I do not feel called upon to set aside their judgment. I am therefore of opinion that the rule be discharged.

WHITE J. having been of counsel for the defendants, gave no opinion.

*Rule discharged.*

NOTE.—A writ of error removing this cause to the Court of Appeals, was presented to this Court, by the plaintiff, at the present term.